SANTEE *v.* BRADY.

4-7719                                                189 S. W. 2d 907

Opinion delivered October 29, 1945.

*Ward Martin,* for appellant.

*Ed E. Ashbaugh,* for appellee.

McFADDIN, J. This appeal involves a permit issued by the Arkansas Corporation Commission on October 24, 1944, to appellant, E. L. Santee, to operate as a commercial carrier of passengers, light express and mail, from Vilonia to Mount Vernon and Rosebud. The appellees are competitors of Santee on part of the route.

We detail the routes and locations involved, to assist in an understanding of the issues. From Little Rock: U. S. highway 65 runs northwesterly to Conway 32 miles; State highway 5 runs north to Vilonia approximately 25 miles; and U. S. highway 67 runs northeasterly to Beebe, 35 miles and on to Searcy (51 miles from Little Rock). U. S. highway 64 runs easterly from Conway via Bryant's store, Vilonia, and El Paso to Beebe (45 miles from Conway). From Bryant's store on U. S. highway 64 (8.2 miles east of Conway) State highway 36 runs northeasterly to Mount Vernon and Rosebud (26.4 miles from Bryant's store); and thence easterly 22 miles from Rosebud

to Searcy. Heber Springs is 12 miles north of Rosebud on State highways 5 and 25. Vilonia (reached from Little Rock by State highway 5 and other public roads) is located on U. S. highway 64, 10.2 miles east of Bryant's store (which is at the intersection of U. S. highway 64 and State highway 36, and is .8.2 miles east of Conway). Mount Vernon is located on State highway 36, 16.4 miles northeast of Bryant's store. Rosebud is located on State highway 36, 10 miles northeast of Mount Vernon. Rosebud is also located on State highway 5, and is 12 miles south of Heber Springs.

Santee had a permit, not here under attack, to operate as a commercial carrier from Little Rock to Vilonia and return, on State highway 5, and connecting public roads, and serving intermediate points. Santee was operating under this permit, and on July 6, 1944, he filed an application to extend his service from Vilonia to Heber Springs, traveling U. S. highway 64 from Vilonia to Bryant's store and State highway 36 from Bryant's store to Mount Vernon and Rosebud, and State highways 5 and 25 from Rosebud to Heber Springs, with certain provisions as to "closed doors," (which expression will be discussed later). This extension permit is the issue now before this court.

The appellees here were the remonstrants before the Commission. They are: (1) Mrs. Carl Brady, who operates a bus line between Conway and Naylor (a point on State highway 36 several miles south of Mount Vernon); (2) Mrs. J. A. Harrison, who operates a bus line from Mount Vernon to Conway on State highway 36 and U. S. highway 64, and also a bus line from Mount Vernon to Searcy on parts of State highway 36; (3) C. M. Mays, who operates a bus line from Rosebud to Searcy on State highway 36; and (4) R. C. Anthony, who operates a bus line between El Paso and Conway on U. S. highway 64.

On August 24, 1944, the Arkansas Corporation Commission granted Santee the extension, not as requested, but only from Vilonia to Rosebud, and with provision for "closed doors" from Vilonia to Mount Vernon and Rosebud; and permitted only through passengers from and to

Little Rock over the extended route from Vilonia to Rosebud. The Commission refused the application from Rosebud to Heber Springs. Since Santee has not appealed from that refusal, we disregard so much of the evidence as concerns availability of transportation to and from Heber Springs.

When the Arkansas Corporation Commission granted the extension permit to Santee under date of August 24, 1944, the remonstrants (appellees) appealed to the Pulaski circuit court, which reversed the order of the Commission and denied Santee the extension. Santee has appealed to this court, and seeks to have the circuit court judgment reversed and the extension permit restored, as granted by the Commission.

The act in effect at the time of the hearing before the Arkansas Corporation Commission was Act 367 of the General Assembly of 1941. 1945 legislation concerning the Arkansas Corporation Commission is not involved in this opinion. The law governing such a case as this one has been fairly well charted, as is shown by the following cases: *Mo. P. R. Co.* v. *Williams,* 201 Ark. 895, 148 S. W. 2d 644; *Potashnick Truck Service, Inc.,* v. *Missouri & Arkansas Transportation Co.,* 203 Ark. 506, 157 S. W. 2d 512; *Taylor* v. *Black Motor Lines,* 204 Ark. 1, 160 S. W. 2d 859; *Potashnick Local Truck System, Inc.,* v. *Fikes,* 204 Ark. 924, 165 S. W. 2d 615; *Mo. Pac. Transportation Co.* v. *Gray,* 205 Ark. 62, 167 S. W. 2d 636. From these cases we mention a few guiding principles:

A. This court tries this case *de novo,* and renders such judgment as appears to be warranted and required by the testimony. Such is the provision in § 2020, Pope's Digest, and the holding in *Mo. Pac. Rd. Co.* v. *Williams,* and also in *Potashnick Truck Service* v. *Mo. & Ark. Transportation Co.*

B. "The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, or additional service would benefit the general public, or unless the existing carrier has been given an

opportunity to furnish such additional service as may be required." Such is the rule stated in *Mo. Pac. Rd. Co.* v. *Williams,* and followed in the later cases, and restated in *Potashnick Local Truck Service* v. *Fikes.*

With these points in mind, we proceed to the facts as disclosed by the record in this case. The Commission allowed Santee to extend his operations from Vilonia to Mount Vernon and Rosebud. Twelve or more witnesses from these last two mentioned localities appeared in support of Santee's application. They testified, and the record abundantly supports them, to the effect that persons living in Rosebud or Mount Vernon have no way to get to Little Rock and transact business and get home the same day, because of the inadequacy of the present service offered by the remonstrants and the connecting lines. Furthermore, the present routes are longer and the fares more expensive than the route proposed by Santee. The extension sought by Santee would allow Mount Vernon and Rosebud citizens to leave home at 7:30 or 8:00 a.m. and travel direct and without transfer to Little Rock, arriving at 10:00 a.m.; and then to leave Little Rock at 3:30 p.m. and reach Mount Vernon and Rosebud at 5:30 or 6:00 p.m. of the same day. No such service is now available to them. The full Santee service, as covered by the extension permit granted by the Commission, would be 7 days a week as follows: Leave Rosebud 7:30 a.m. and 3:30 p.m. (Mount Vernon thirty minutes later in each instance) and arrive in Little Rock at 10:00 a.m. and 6:00 p.m., respectively. Leave Little Rock 7:30 a.m. and 3:30 p.m., and arrive in Rosebud 10:00 a.m. and 6:00 p.m., respectively, (Mount Vernon thirty minutes earlier). Santee would use two new buses for this extension, with a capacity of 28 persons for each bus.

I. *Public Convenience and Necessity.* Should the people of these communities—Rosebud and Mount Vernon—have the benefit of this Santee service, or is the present service ample and satisfactory for all practical purposes? In Pond on "Public Utilities," 4th Edition, § 913, the rule is stated:

"In granting certificates, the public convenience and necessity should be the first consideration, and the interest of public utilities already serving the territory secondary, while the desire of a new applicant for a certificate is relatively a minor matter for the consideration of the commission."

And in 42 C. J. 687, in discussing the determination of public convenience and necessity, the rule is stated:

"The convenience and necessity which the law requires to support the public service commission's order for the establishment or extension of motor vehicle transportation service is the convenience and necessity of the public as distinguished from that of an individual or any number of individuals, and this is the primary matter to be considered in determining what constitutes such public convenience and necessity in a particular case, and the propriety of granting a certificate to that effect. The necessity for the proposed service must be considered as well as the added convenience thereof, although the word 'necessity' is not used in this connection in the sense of being essential or absolutely indispensable, but in the sense that the motor vehicle service would be such an improvement of the existing mode of transportation as to justify or warrant the expense of making the improvement."

At present the people in Rosebud and Mount Vernon, to get to Little Rock, must travel by bus to either Conway or Searcy, and then transfer to another conveyance to reach Little Rock. The remonstrants say this is sufficient service, but the record shows otherwise.

First, let us take the situation of the Mount Vernon people. If they desire to go to Little Rock via Conway, then they must use the service of either the Harrison bus line, or the Brady bus line. The former consists of one bus operated by Mrs. Harrison between Mount Vernon and Conway. On Tuesdays, Thursdays, and Saturdays the bus starts from Mount Vernon at 9:30 a.m. and arrives in Conway at 11:00 a.m., and leaves Conway at 2:30 p.m., and arrives in Mount Vernon at 4:00 p.m. In

the summer months the bus does not operate on Thursdays. On Saturdays the bus makes an additional trip, which leaves Mount Vernon about 5:00 p.m., and arrives in Conway about 6:30 p.m., and leaves Conway at about 10:00 p.m. and arrives in Mount Vernon at 11:30 p.m. There is no service from Mount Vernon to Conway on Mondays, Wednesdays, Fridays and Sundays. Anyone in Mount Vernon using the Harrison bus line on Tuesdays or Thursdays would arrive in Conway at 11:00 a.m., and have to transfer from station to station to secure a conveyance to Little Rock. In order to make a round trip in one day, there would be less than an hour allowed in Little Rock. There is no other bus line shown from Mount Vernon to Conway. The Brady bus line operates from Naylor, which is a point on State highway 36 several miles south of Mount Vernon, so Mount Vernon persons desiring to use the Brady bus line to Conway would have to secure independent transportation to Naylor.

Next, let us take the situation of Mount Vernon people seeking to go to Little Rock via Searcy. The Harrison bus line leaves Mount Vernon at 9:00 a.m. on Mondays, Wednesdays and Fridays, and arrives in Searcy at 10:15 a.m. Returning, it leaves Searcy at 3:15 p.m., and arrives in Mount Vernon at 4:30 p.m. There is no service on the Harrison bus line from Mount Vernon to Searcy on Tuesdays, Thursdays, Saturdays and Sundays. Even on Mondays, Wednesdays and Fridays, Mount Vernon people going to Little Rock via Searcy cannot return home the same day under the present schedule.

Next, we consider the transportation facilities available to the people of Rosebud. There is no service from Rosebud to Little Rock via Conway. There is service from Rosebud to Little Rock via Searcy, because C. M. Mays operates a bus line from Rosebud to Searcy, leaving Rosebud at 9:00 a.m., arriving Searcy 10:28 a.m.; leaving Searcy 3:00 p.m., arriving Rosebud 4:28 p.m. People of Rosebud desiring to go to Little Rock, if they make perfect connection in Searcy, would have only ten minutes in Little Rock before returning to Searcy, or else would be required to be away from home overnight. The

Mays bus line is the only service shown from Rosebud to Searcy.

Such, in brief, is the bus service now furnished by the remonstrants, and connecting carriers. The remonstrants were supported by witnesses high in the praise of the present service. But opposed to them were more than twelve witnesses from Mount Vernon and Rosebud, claiming to speak for themselves and others, and urging the Santee extension as a direct line to Little Rock, whereby Rosebud and Mount Vernon people could leave home of a morning and have from 10:00 a.m. to 3:30 p.m. to transact business in Little Rock, and still return home by 5:30 or 6:00 p.m. of the same day. No such service is now available to the people of Rosebud and Mount Vernon. If—as stated by Pond, *supra*—the first consideration is the public convenience and necessity, then certainly a case was made here for the granting of the permit, because—even though there is existing service in operation—still, (1) the existing service is inadequate; and (2) additional service would benefit the general public. Under either of these showings (*i.e.,* inadequacy of present service, or benefit from additional service) the permit should be granted under the rule stated in *Mo. Pac. Rd. Co.* v. *Williams, supra.*

II. *Rights of Existing Carriers.* The remonstrants claim that since they are existing carriers, they are entitled to an opportunity to furnish additional and improved service before any permit should be granted to Santee to operate in competition to them. They say:

"The appellees herein testified, as disclosed by the record, that no complaints have been made to them or to the Corporation Commission that the bus service rendered by them is inadequate or inconvenient or does not meet the public requirements. The appellees testified in their own behalf that they are ready and willing at this time to rearrange their schedules or put on additional schedules if so requested by their patrons if the Commission found there is a public need for such additional service."

There are two answers to this argument: one is legal, and the other is factual. On the law question, the appellees misunderstand the rule stated in *Mo. Pac. Rd. Co.* v. *Williams*, which rule is:

"The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, *or* additional service would benefit the general public, *or* unless the existing carrier has been given an opportunity to furnish such additional service as may be required." (Italics our own.)

The opportunity to the existing carriers is in the disjunctive sense of "or" rather than the conjunctive "and." In other words, the certificate may issue if public convenience and necessity be shown, even if there be already existing service, provided the Commission finds either:

a.   that the present service is inadequate; or

b.   that additional service would benefit the general public; or

c.   that the existing carrier has been given an opportunity to furnish additional service as may be required.

In 37 Am. Juris. 530, in discussing the issuance of a certificate of public convenience and necessity where service is already in operation on the same route, the rule is stated disjunctively, as follows:

"The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, or additional service would benefit the general public, or the public desires a different means of transportation, or unless the existing carrier has been given an opportunity to furnish such additional service as may be required."

But even if the law were as the appellees contend on this matter of preferred opportunity to existing carriers to forestall any new competition—and the law is not as the appellees contend, as we have just demonstrated—

still, under the facts in the case at bar, the previously operating carriers (appellees) have made no showing that they ever could give the people of Mount Vernon or Rosebud service equal to that which Santee is offering. The Santee route is from 10 to 20 per cent. shorter in mileage and cheaper in fare than any possible computation of mileage and fare based on traveling via Conway or Searcy. Furthermore, if the appellees (Harrison, Brady and Mays) should change their schedules and services and fares to Conway and Searcy, and offer daily schedules, still the appellees make no showing that they could compel the connecting carriers at Conway and Searcy likewise to rearrange their schedules, services and fares to correspond with the revisions made by these appellees. So, on the facts, the appellees have failed to show that they could render a service as cheap or as convenient as that offered by Santee under the extension permit issued by the Commission.

There remains the contention of the other appellee, R. C. Anthony (remonstrant below), which we now discuss. Anthony operates a bus line between El Paso (located on U. S. highway 64 east of Vilonia) through Vilonia to Conway. The basis of the Anthony protest was that if Santee should be granted the extension to Vilonia and Rosebud, then Santee might carry passengers from Vilonia to Bryant's store (10.2 miles distance) in competition to Anthony. The order of the Commission in granting Santee's extension directed that he operate with "closed doors" between Vilonia and Mount Vernon. The expression "closed doors" when used by regulatory authorities in connection with the operation of motor carriers is generally defined as meaning: the operation of a common carrier motor vehicle between designated points or over designated routes without receiving or discharging passengers between such points or over such routes. Applied to this case, the expression "closed doors" means that Santee could pick up no passengers between Vilonia and Mount Vernon, or between Vilonia and Rosebud. This order of the Commission regarding closed doors completely answers Anthony's protest. If Santee should not obey this order and should open the

doors of his buses and pick up passengers in competition with Anthony, then Anthony could secure relief before the Commission.

It follows from what has been herein stated that the Commission was correct in granting the permit for extension to Santee under the provisions and restrictions as made by the Commission; and that the circuit court was in error in reversing the order of the Commission. The judgment of the circuit court is reversed, and the cause remanded to that court with directions to affirm the order of the Commission granting the Santee extension.

Mr. Justice ROBINS did not participate in the consideration or decision of this case.